IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

EMPIRE INDEMNITY INSURANCE
COMPANY,

       Plaintiff,

vs.                                       CASE NO.: 4:06cv439-SPM/WCS

ASHLEY WINSETT, individually, et al.,

       Defendants.
_____/

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Pending before the Court are the parties' cross motions for summary judgment (docs. 35 and 48). This is a declaratory judgment action filed by Empire Indemnity Insurance Company (Empire) to determine insurance coverage. The issue presented is whether the commercial general liability policy that Empire issued to Defendants, The Housing Trust Group of Florida LLC and the Preserve at San Luis LLC, provides coverage for claims in a lawsuit filed by 56 renters for, among other things, damages from mold in the apartments that they rented from Defendants.

**I.**     **Renters' Lawsuit**

The renters allege that in the Spring and Summer of 2003, Defendants were rushing to build The Preserves apartments in an effort to have the

apartments available to students in the fall of 2003. Prior to the actual construction, there was a aggressive promotional campaign. The renters entered int lease agreements with the anticipation that a host of amenities would be provided, including tanning beds, a swimming pool, a jacuzzi, a gym, a computer lab, a cyber café, a dog park, and a basketball court.

The renters moved in sometime around August 20, 2003. They were required to pay rent for the entire month of August. None of the amenities were available, but the manager of the apartment complex continually reassured the renters that the amenities would be available shortly. By October of 2003, the amenities were still not available. When the mother of one of the renters inquired, she was told that the delay in providing amenities was the result of changing contractors. She was told that construction crews were working around the clock to finish the club house and other facilities that were originally promised. The mother visited shortly thereafter and discovered that no one was working on the club house or pool: no construction had been initiated, let alone completed.

During the course of the fall semester, the renters became progressively aware of a pervasive, acrid smell in the apartments. They also experienced physical illness. One renter who vacated in December 2003 advised another renter that she was vacating her apartment due to mold and resulting health problems. Upon inquiry, the manager stated that the mold problem was limited

to that one apartment.  The manager also indicated that the mold may have been caused by uncleanliness on the part of the renter who vacated.

Several renters complained to management about the odor in their apartments.  Some hired carpet cleaners at their own expense, but the odor remained.  In January 2004, three of the renters asked to be released from their leases.  Only one was successful.

Sometime around the fall of 2003, Defendants began drilling holes surreptitiously in the walls of various apartments. Gray patches of concrete began showing up all over.  Inquiries by residents about the patches to management yielded explanations about settling of the building or peeling of paint.

The renters obtained legal counsel.  An inspection conducted for the renters by a certified home inspector concluded that the patches were the result of individuals drilling holes in the walls to test for water and moisture.  Despite numerous inquires, Defendants failed to address or even acknowledge the mold problem.

In response to a letter by the renters' attorney, the renters were notified on Thursday, March 18, 2004, that they would be required to vacate their homes by Sunday, March 21, 2004, so that "renovations" could be completed.  The notice was provided in a one-page flyer that did not specify the nature of the renovations.  Upon inquiry by some renters about the work being done, the

manager refused to explain.  The manager did state, however, that accommodations in another facility, Seminole Oaks, would be provided to renters.  These accommodations were dorm-like suites, with two individual rooms with two people in each room and a connecting bathroom in between.  They were not comparable to the three-bedroom townhouses the renters had leased at The Preserves.

The renters were led to believe that the accommodations in Seminole Oaks were clean, secure, internet-friendly, and furnished with a computer lab and pool.  Seminole Oaks, however, was itself under construction.  Jack hammers started at 7:00 a.m.  The pool was covered with a tarp.  There were no phone lines in the rooms.  There was no security.  Younger students were allowed to run wild and cause all manner of havoc at all hours of the evening.  The manager promised to bring the renters televisions to allay some of the inconveniences of forced relocation.  The manager only brought a hand full of televisions, however.  One renter had her property ruined because a toilet at Seminole Oaks overflowed.

The renters were assured that while renovations were taking place at The Preserves, work crews would be supervised at all times by someone from the management office.  Renters, however, observed work crews working alone in apartments without anyone from management to be found.

On the afternoon of April 2, 2004, the manager called some renters to

inform them that the renovations were complete and that they could return to The Preserves. The renters were told that they were expected to move out of Seminole Oaks by April 4, 2004. Renters observed workers at The Preserves still actively engaged in labor in the apartments. Some apartments still had large dehumidifiers running at full volume. The carpet in several of the apartments had been torn out and not replaced. In one apartment, the dehumidifier caused damage to a renter's property.

The renters filed a seven-count complaint against Defendants. In Count 1, the renters allege fraudulent inducement of contract based on Defendants' false promise of amenities. In Count 2, the renters allege breach of contract based on Defendants' failure to provide amenities throughout the leasing term. In Count 3, the renters allege unjust enrichment based on (a) Defendants failure to provide amenities yet accepting full rental payment, (b) double exaction for service by charging a "hassle-free move out fee" to cover clean-up costs and still charging a security deposit, and (c) requiring full pay for the first months' rent in August without proration. In Count 4 the renters allege Defendants violated the Florida Deceptive and Unfair Trade Practices Act by making misleading promotions about amenities, misrepresenting and withholding information about mold, misrepresenting and withholding information about construction defects, falsely stating that the renovations at The Preserves made the apartments habitable and mold-free, and ordering the renters to vacate without advising them of the

reason, increasing the fee for late payment of rent, and rescinding the housing alternative housing at Seminole Oaks without first disclosing the situation at The Preserves.  In Count 5, the renters allege negligence based on Defendants' construction of The Preserves without a vapor barrier, thus resulting in mold.  In Count 6, the renters allege that Defendants violated housing codes by allowing a health hazard from mold and by retaining security deposits without providing required notice.  In Count 7, the renters allege that Defendant violated the Florida Fraudulent Transfer Act by transferring $30,000,000.00 to another entity to avoid liability.

## II.     Empire Policy

Empire issued a Commercial General Liability policy to Defendants.  The policy provides coverage for an occurrence, which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  The policy contains exclusions for mold and intentional acts.

The mold exclusion states that Empire's insurance coverage does not apply to:

> a.     "Bodily injury" or "property damage" which would not have occurred, in whole or in part but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.
>
> b.     Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying,

>   neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any insured or by any other person.
>
>   This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for consumption,

The intentional acts liability exclusion states that Empire's insurance coverage does not apply to:

>   "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. The exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### III.    Discussion[1]

In the insurance context, "coverage" is a term that encompasses two basic duties that an insurance company has with respect to its insured. Morgan Int't Realty, Inc. v. Dade Underwriters Ins. Agency, 617 So. 2d 455, 457 (Fla. 3d Dist. Ct. App. 1993). One duty is the duty to indemnify; that is to pay money for a claim covered by the policy. The duty to indemnify arises only after a final determination is made based on the actual facts of the incident that a claim is covered by the policy. Illinois Ins. Exch. v. Scottsdale Ins. Co., 679 So.2d 355, 358 (Fla. 3d Dist. Ct. App. 1996).

---

[1] Florida law applies generally to this case because it is a diversity action. Florida law also applies to the construction of the Empire insurance policy because Defendants are Florida corporations with their principal places of business in Florida. See Serfozo v. Travelers Indem. Co., 788 So. 2d 278 (Fla. 4th Dist. Ct. App. 2000) (a policy is to be construed under the law of the state in which it was delivered).

CASE NO.: 4:06cv439-SPM/WCS

The other duty is the duty to defend; that is to defend the insured in a lawsuit for a claim that may be covered under the policy. The duty to defend is much broader than the duty to indemnify because it is determined by examining the allegations made against the insured, without regard to the actual truth or falsity of the allegations. Baron Oil Co. v. Nationwide Mut. Fire Ins. Co., 470 So.2d 810, 813 (Fla. 1st Dist. Ct. App. 1985). If the allegations set forth any facts which potentially bring a claim within the scope of the policy's coverage, then the insurer has a duty to defend. Id. All doubts concerning the existence of a duty to defend are resolved in favor of providing a defense. Id. at 814. It is only when all claims undoubtably fall outside the scope of a policy's coverage that an insurer will have no duty to defend, much less a duty to indemnify. Id.

Empire argues that the renters' claims against Defendants undoubtably fall outside of the scope of the policy's coverage based on the mold exclusion. Empire also contends that any remaining claims involve intentional acts by Defendants and therefore do not arise from an "occurrence" within the meaning of the policy, and that the claims are otherwise excluded by the intentional acts exclusion. Finally, Empire argues that Defendants' are not entitled to attorney fees.

### A. mold exclusion

The renters make several claims for damages related to mold. Defendants argue that despite the mold exclusion, these claims are covered

because the allegation that Defendants negligently failed to construct The Preserves with a vapor barrier is a construction defect that is a covered occurrence and the efficient proximate cause of the renter's mold damage. The Court agrees.

There are two standards in Florida for determining whether a claim is covered when damage is the result of more than one cause. Palucci v, Liberty Mut. Fire Ins. Co., 190 F.3d 1312, 1318 (M.D. Fla. 2002). The standard to apply hinges on whether the causes are dependent or independent from each other. Id. "Causes are independent when they are unrelated such as an earthquake and a lightning strike, or a windstorm and wood rot." Id. at 19. "Causes are dependent when one peril instigates or sets in motion the other, such as an earthquake which breaks a gas main that starts a fire." Id.

If the causes are dependent on each other, then the efficient proximate cause doctrine applies. Id. The efficient proximate cause is the cause that instigates or sets the other causes in motion. Hartford Accident and Indem. Co. v. Phelps, 294 So. 2d 362, 364 (Fla. 1st Dist. Ct. App. 1974). If the efficient proximate cause of damage is a covered cause, then the claim for damages will be covered. Palucci, 190 F.Supp.2d at 1318. If the efficient proximate cause is not covered, then the claim for damages is not covered even if the contributing causes are covered. Id.

If the causes are independent of each other, then the concurrent cause

doctrine applies.  Id.  Under the concurrent cause doctrine, coverage is provided so long as one cause is covered, even if other causes are not covered.  Wallach v. Rosenberg, 527 So. 2d 1386, 1387 (Fla. 3d Dist. Ct. App. 1988).

The Empire policy contains an anti-concurrent-cause provision, which is enforceable in Florida.  Palucci, 190 F.Supp.2d at 1319.  Thus, if the failure to install a vapor barrier and the mold are independent causes of the renters' damages, then the concurrent cause doctrine would apply.  Coverage, however, would be precluded under Empire's anti-concurrent-cause provision.

Conversely, if the failure to install a vapor barrier and the mold are dependent upon each other, then the efficient proximate cause doctrine applies.  Coverage would be available if the failure to install the vapor barrier instigated or set in motion the mold growth, leading to the renters' damages.  This is what the renters allege happened.  Therefore, despite the mold exclusion, the renters' damages are covered under Empire's policy because the negligent failure to install a vapor barrier is a covered construction defect that is the efficient proximate cause of the renters' damages.

Despite Empire's argument, the anti-concurrent-cause provision does not preclude coverage.  This is because the failure to install a vapor barrier is a covered cause that led to the mold.  Fayad v. Clarendon Nat'l Ins. Co., 899 So.2d 1082, 1087-88 (Fla. 2005).  Empire's policy contains no "lead-in" provision so as to exclude from coverage damage for mold when the cause of the mold is a

covered event. Id. Furthermore, contrary to Empire's argument, applying principles of efficient proximate cause does not render its mold exclusion meaningless. C.f. Arawak Aviation v. Indem. Ins. Co. of N. Amer. 285 F.3d 954, 957 (11th Cir. 2002) (declining to apply efficient proximate cause doctrine where the efficient cause is always antecedent to the damage's direct cause). Mold has many causes aside from construction defects, especially in humid climates like Florida.

Because the allegations of the renters' complaint set forth facts that potentially bring a claim within the scope of Empire's policy coverage, Empire has a duty to defend. Baron Oil Co. v. Nationwide Mut. Fire Ins. Co., 470 So.2d 810, 813 (Fla. 1st Dist. Ct. App. 1985). The duty to defend extends to all claims in the renters' complaint, even those claims that are not covered. Tropical Park Inc. v. United States Fidelity & Guar. Co., 357 So. 2d 253, 256 (Fla. 3d Dist. Ct. App. 1978) ("Where the complaint contains allegations partially within and partially outside the scope of coverage, the insurance carrier has a duty to defend the entire suit."). Therefore, it is unnecessary to address the intentional acts exclusion or the issue of whether the other claims in the renters' complaint constitute an occurrence.

Based on the foregoing, Empire's motion for summary judgment will be denied. Defendants' motion for summary judgment will be granted.

### b. attorney fees

As the prevailing party in a declaratory judgment action involving insurance coverage, Defendants are entitled to attorney fees under section 627.428, Florida Statutes. Accordingly, it is

ORDERED AND ADJUDGED:

1. Empire's motion for summary judgment (doc. 35) is denied and Defendants' cross motion for summary judgment (doc. 48) is granted.

2. The clerk shall enter judgment for Defendants stating that Empire has a duty to defend the renters' claims against Defendants and that Defendants' are entitled to attorney fees.

DONE AND ORDERED this 3rd day of April, 2008.

*s/ Stephan P. Mickle*
Stephan P. Mickle
United States District Judge